IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CARL E. RODGERS,** | : | **Civil No. 1:20-CV-2115** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PENNSYLVANIA STATE POLICE,** | : | |
| **JEFFREY STINE, DEAN SHIPE,** | : | |
| **SCOTT DENISCH, SEAN MOYER,** | : | |
| **MARK MAYGAR and JOHN DOES,** | : | |
| | : | |
| **Defendants.** | : | **Judge Sylvia H. Rambo** |

## M E M O R A N D U M

In April 1983, a 23-year-old wife and mother was found dead in the woods off a remote road in rural Pennsylvania. More than thirty year later, her husband, Carl Rodgers, was charged with her murder but later acquitted by a jury. Rodgers has now initiated this Section 1983 action, wherein he asserts violations of his constitutional rights and seeks money damages from the Pennsylvania State Police ("PSP") and the state troopers involved in the investigation. Rodgers alleges, *inter alia*, that the troopers maliciously withheld potentially exculpatory evidence to convince the grand jury that probable cause existed to support filing charges against him.  But not every failed prosecution is a malicious one.

1

## I.   **Factual Background and Procedural History**[1]

The events underlying Rodgers' criminal prosecution began to unfold four decades ago on April 23, 1983, when his wife, Debra Rodgers ("Debra"), went missing. At approximately 4 p.m. that day, Rodgers called Debra's mother to inquire about Debra's whereabouts, prompting her family to immediately drive to the couple's dairy farm in Loysville, Pennsylvania. Remarkably, Rodgers then led her family directly to a dirt road in a heavily wooded area where they soon found Debra's car. Debra, however, was nowhere to be found. The next morning, Debra's brothers located her body several hundred yards away from where her car had been abandoned. Her body had visible signs of trauma as well as deep slashes across both

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.1 be supported "by a separate, short, and concise statements of material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues for trial. *See id.*

In addition to providing a brief responsive statement of material facts (*see* Doc. 52-3), Rodgers included within his opposing brief a "contra statement of facts" (*see* Doc. 52 pp. 3-7). Neither Rule 56.1 nor Local Rule 56.1 authorizes this portion of his filing, and Rodgers did not request leave of court for its inclusion. Defendants thus object to its consideration. (*See* Doc. 53 pp. 5-7 (moving to strike contra statement of facts)). However, because the court prefers to resolve disputes on the merits rather than on procedural deficiencies, and considering the record on summary judgment must be viewed in the light most favorable to the non-movant, the court has considered and scrutinized this supplemental information as well as the entire record to determine the uncontroverted facts in this matter.

Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts, Rodgers' contra statement of facts, and the exhibits of record.

wrists, indicative of suicide. A knife and sheath bearing Rodgers' name was recovered nearby.

An investigative grand jury convened shortly after Debra's body was discovered for the purpose of determining whether the Commonwealth should commence criminal proceedings against Rodgers in connection with his wife's death. At the conclusion of its investigation, however, the grand jury was not requested to issue a presentment.

In 2015, another investigative grand jury convened to consider whether criminal proceedings should be instituted against Rodgers.[2] This time, the grand jury issued a presentment, recommending that the Commonwealth charge Rodgers with

---

[2] Shortly before the second grand jury convened, a PSP criminal investigative assessment unit met to discuss the then-stale investigation and recommended it resume as follows:

> 1. Interview husband Carl. Record interview. Lock him into a story, then confront and accuse him. 2. Interview daughter [Christine Rodgers]. 3. If she is on board, do a consensual call. 4. Research if any phone calls are available. It appears that news of the new state job was the trigger. 5. Sort through evidence. Determine if any evidence can be submitted for testing under new technologies. Look for fingernail scrapings for DNA testing. 6. Check with Clerk of Courts and DA's office for all grand jury transcripts. 7. Interview Carl's brother. Ask if he would be willing to wear a wire and talk to his brother about murder. 8. Re-interview victim's friends and co-workers. 9. Talk to all of Carl's friends and co-workers to see if he ever discussed wife's death or marital issues. 11. Media blitz to rattle Carl. 12. Grand Jury presentment. 13. Discuss case with DA. See if charges will be approved now. Use outside county if needed. 14. Obtain DHQ copy of report. There may be new information not in station copy.

(Doc. 52-5 pp. 93-94.)

murder. The presentment detailed the grand jury's findings in support of its

conclusion. It read, in its entirety, as follows:

> The Grand Jury conducted an investigation into the death of 23-year-old Debra Jane Rodgers. Debra's body was discovered by her mother on April 24, 1983 in a heavily wooded area of Perry County, Pennsylvania. She suffered severe blunt force trauma to her head and body. Both of her wrists had been deeply slashed as if to make her death appear to be the result of suicide. The Grand Jury determined, however, that Debra was murdered by her husband, Carl Rodgers.

> The Grand Jury heard testimony that Carl and Debra Rodgers married in 1977 and had a daughter. They lived in a trailer on the Rodgers' family dairy farm located in Loysville, Perry County. The two-bedroom trailer was located approximately 50 yards from the main house where Carl's parents and grandmother lived. The Grand Jury learned that Carl worked full-time on the family farm and that Debra worked as a seasonal clerk at Little Buffalo State Park in Newport, Perry County.

> Dean Peters, Debra's brother, testified before the Grand Jury and stated that he was visiting his parents on Saturday, April 23, 1983 when the family received a telephone call at approximately 4:00 p.m. from Carl who advised that Debra was missing. Debra's sister, Elizabeth Peters Derr, testified that she answered the telephone call and Carl asked if Debra was with the Peters family. Elizabeth responded that Debra was not with them.

> Ruby Voorhees testified that while she was at the trailer, Carl stated that Debra was upset and frustrated with her job because she was not learning everything quickly enough. Carl further stated that he and Debra had discussed this issue the previous evening and that they had argued about it. Ruby testified that when she pressed Carl for information, he "explained that, after they had their argument, he went to bed and then she stayed out in the living room with [their daughter] and watched TV until late and he fell asleep. Then when he woke up later, she had gotten in the car and left. He heard her car start up and leave."

David Peters testified that Carl told the family that Debra had gone to work on Saturday morning. A family member called Debra's place of employment, however, and was told that Debra had not reported to work that day. Debra's mother then noticed that Debra's jacket was hanging on a peg in the trailer and that her purse was also in the trailer. David testified that the family members decided to go look for Debra.

Dean Peters testified that the family asked Carl where to search for Debra and he suggested a specific location. Carl claimed that patrons of Little Buffalo State Park had asked about various locations and Debra "was upset about not knowing where these places were."[3] Dean testified that he and Carl were in the same vehicle—which was the lead vehicle—and that Carl directed Dean where to go. At approximately 7:00 p.m., Debra's vehicle was located.[4] According to Dean, the family did not search anywhere else before arriving at the location where Debra's vehicle was found.

The Grand Jury learned that the location where Debra's vehicle was found was approximately 4.6 miles from the Rodgers' farm. The main road is Route 850, also known as Fort Robinson Road. The dirt road that Carl directed Dean to turn onto from Route 850 was known at the time as Tower Road and is now known as Little Valley Road. It is a state forest access road in a remote area that is heavily wooded on either side. There is no lighting on this narrow dirt road. Debra's vehicle was located approximately six-tenths of a mile into Tower Road from Route 850. Members of the Pennsylvania State Police ("PSP") travelled the route taken as directed by Carl on the night of the search for Debra. The route was recorded using a PSP patrol vehicle dashboard camera. The Grand Jury viewed the footage and observed the isolated nature of Tower Road. The area where Debra's car was located was approximately 50-100 feet below a pull-off on the right side of Tower Road on a logging path that continued downhill deeper into the woods. Her vehicle was not located in the pull-off area itself, but farther down the hill.

---

[3] In a sworn affidavit disputing several facts outlined in a PSP report, Rodgers states that Debra actually asked him about three different locations during their conversation. (Doc. 52-5 p. 74 ¶ 2.)

[4] Rodgers avers that, contrary to the PSP report, both he and Dean spotted the vehicle simultaneously. (*Id.* at p. 74 ¶ 1.)

David Peters and Ruby Vorhees both testified that upon arrival at Debra's vehicle, Carl unlocked her car with a set of keys from his pocket. Upon entering the car, Carl immediately reached under the passenger side floor mat and retrieved a second key.[5] Dean Peters testified that Carl suggested they continue driving up the logging road while the other family members searched the woods near the vehicle. David described Carl's demeanor as very subdued and quiet. He also noted that Carl would not make eye contact with members of Debra's family.

David Peters testified that at some point during the search, he and Ruby Vorhees went back to the Rodgers' farm to call the police. However, the police advised them that Debra had not been missing long enough to start an investigation. David testified that Carl's parents, Earl and Shirley Rodgers (now deceased), were reluctant to contact the police and repeatedly questioned David as to whether that was what Carl wanted. The Rodgers also advised that they did not have any flashlights to provide for the search nor did they ask how the search was progressing.

The Grand Jury learned that the search for Debra was called off at approximately 10:00 p.m. or 11:00 p.m. once it became too dark to continue. David Peters testified that Carl refused to leave Debra's car where the family had found it and insisted on driving it back to the farm. David testified that he expressed concern that, "What happens if she is down here and comes back for her car? She is going to be cold and needs to get it. No. No. No. I'll take the car back, and he didn't want to leave it set there." Mark Peters stated that he also was concerned about Carl taking the car and that he said, "What if she comes back? She knows where the car is. She won't be able to get home."[6]

Mark Peters, another one of Debra's brothers, testified that he arrived at the location where the car was found at approximately 6:00 a.m. on Sunday, April 24, 1983 to continue the search with other family

---

[5] Rodgers claims that it was actually Debra's mother who retrieved the keys. (*Id.* at p. 74 ¶ 4.)

[6] Rodgers disputes that he drove Debra's car home over the objection of others, stating that "[t]he truth is [his] father and/or Debra's father decided that the car should not be left at the scene." (*Id.* at p. 74 ¶ 3.)

members. He testified that Carl approached him and suggested that the two of them search the ridge opposite of where Debra's body was ultimately found while other family members searched the woods below.

Mark Peters testified that he heard a car horn blow and assumed Debra had been found. Debra's father picked up Mark and Carl and told them that they had found Debra. Carl did not ask any questions despite the fact that her father did not say whether Debra had been found alive or dead. Mark was present when Debra's body was removed from the location. Mark testified that Carl did not say anything.

William Miller, Debra's cousin, told the Grand Jury that he was present when Carl was informed that Debra was dead. He stated that Carl was expressionless and did not ask any questions as to where she was found nor did he make any other inquiries.

Debra's body was located several hundred yards from where her vehicle was located at the bottom of the hill in a wooded area. Her shirt was pulled approximately halfway up her torso as though she had been dragged to the location. One shoe was off her foot and her glasses were located several feet from her body. In addition, a knife was located approximately 15 feet from her body along with its sheath bearing the name "Carl."

Carol Orris ("Orris") testified before the Grand Jury. She stated that she lived in Ickesburg, Perry County across Route 850 from a hunting camp known as Camp Ten Points and near the area where Debra's body was found. Camp Ten Points is a privately owned hunting camp in a heavily wooded area. The unpaved lane to the camp is long and wooded on either side. Towards the top of the lane, there is a house and a pond on the right side. At the top of the lane, there is a large clearing to the left abutting the wooded area where Debra's body was found.

Orris testified that, at approximately 2:00 a.m. on Saturday, April 23, 1983, she observed a vehicle turn left from Route 850 onto the private dirt lane leading to the camp. She stated that the vehicle drove all the way up the lane until she could no longer see its headlights. She stated that approximately one half-hour later, she observed the vehicle come back down the lane and turn right onto Route 850. Orris explained that

she was concerned about seeing the vehicle because the camp's owners were not present that weekend and it was unusual for a vehicle to be going up the lane in the middle of the night.

Travelling from the Rogers' farm, the turnoff to Tower Road from Route 850 is before the turnoff to Camp Ten Points and the Orris residence. There is easier, level access to the location where Debra's body was found from Camp Ten Points than from the area where her car was found on Tower Road. Debra's body was located approximately 200-250 yards from the cleared area at the top of the private lane leading to Camp Ten Points. PSP Trooper Sean Moyer testified that in 1983, part of the wooded area abutting the clearing was a field. Accordingly, the field would have provided even closer access to the location where Debra's body was found. The entrance to Camp Ten Points is approximately one-half of a mile from the entrance to Tower Road on Route 850. Orris described the vehicle she observed in the early morning hours of Saturday, April 23, 1983 as turning left into the entrance to Camp Ten Points (from the direction of the Rodgers' frum and Tower Road) and later turning right back onto Route 850 (towards the Rogers' farm and Tower Road).

On May 2, 1983, Carl was interviewed by now-retired PSP Trooper Michael Brennan ("Trooper Brennan"). Carl stated that on Friday, April 22, 1983, he was working with his parents in the barn on the family farm and that Debra was late returning from work. He stated that he and Debra went to their trailer at approximately 7:30 p.m. and he took a shower. After getting out of the shower, he found Debra sitting on their bed, appearing distraught. Carl told Trooper Brennan that he asked her what was wrong and she stated, "Just let me die in peace." According to Carl, Debra stated that she was not any good to anyone and that her co-workers had to guide her through her work. Carl claimed that he told Debra that he and their daughter, then five years of age, loved and needed her.[7]

Carl further told Trooper Brennan that he and Debra continued the discussion about Debra's work. Carl claimed that Debra asked him how

---

[7] Although the court cannot ascertain a substantive difference in these facts, Rodgers affirmatively disagrees with the portrayal of this conversation, stating that he actually said "[h]e loved Debra and that Chrissy loved and needed her." (*Id.* at p. 75 ¶ 5.)

to get to various locations in the area that she had been asked about at work. One of these areas, according to Carl, was Tower Road. Carl claimed that Debra stated that she had been asked about these locations at work and was bothered by her inability to provide directions. The Grand Jury learned that the area of Tower Road where Debra's car was found has no point of interest and was used mainly as a logging road in 1983.

Carl stated that he eventually went to bed at approximately 1:15 a.m. and Debra fell asleep shortly after. He stated that he awoke at approximately 5:15 a.m. and discovered that Debra was gone. He explained that he had assumed that Debra had gone into work early.

Carl stated that, at approximately 3:00 p.m. on April 23, 1983, he drove to Little Buffalo State Park but did not see Debra's vehicle. He told Trooper Brennan that he started calling people in an effort to locate Debra at approximately 5:00 p.m. Carl stated that he accompanied members of Debra's family to look for her and told them about the area on Tower Road. Carl acknowledged that he spotted Debra's car off of Tower Road. He further advised that her body was found the following morning.

Carl initially denied that he had an argument with Debra on Friday evening. He claimed that Debra stated that she could not do anything right anymore, that she was losing her memory and that their daughter and Carl would be better off without her. Carl denied striking Debra and denied leaving the trailer after 7:30 p.m. Upon being confronted by Trooper Brennen that he felt Carl was holding back information, Carl stated that he thought Debra was going to kill herself and so he checked his gun cabinet. Carl explained that is when he noticed that his knife was missing. He stated that he assumed Debra had used the knife to hurt herself.

Carl subsequently admitted that he and Debra had argued on Friday evening. He claimed that Debra wanted to quit her job but he did not want her to do so. He stated that the two "hollered" at each other, resulting in their daughter coming into the bedroom and Carl sending her back out. He claimed that Debra stated that she would be better off dead and Carl replied, "maybe so." Carl stated that he did not remember if he struck Debra, but he did not think that he had.

Carl then told Trooper Brennan that he went to bed at 9:50 p.m. He believed he recalled Debra coming to bed but was not certain of it. He again stated that he did not remember hitting his wife but admitted that he did grab her once by the right arm. He denied killing her. According to Trooper Brennan, Carl refused to believe that Debra had been murdered until he was shown pictures of her injuries at which point he agreed that she had been murdered.

On November 1, 1985, now-retired PSP Trooper Theodore Engle interviewed Carl. During that interview, Carl stated that Debra had been having problems during the second week of her employment at Little Buffalo State Park because she was not sure of herself and did not know if she could handle the job. Carl further relayed a story regarding two park patrons whom he claimed made inappropriate remarks to Debra on the Friday before she went missing.

Carl reiterated that he and Debra argued on Friday after she came home late from work. He stated that he and his parents were well into the milking time on the farm and that Debra did not arrive until 6:30 p.m. or later. Carl stated that he confronted Debra about her whereabouts and she stated that she was at the grocery store. Carl did not think Debra had enough grocery items to account for the late arrival, however. Carl stated that they argued and he grabbed Debra by the wrist. He explained that when Debra said he would be better off without her, he thought she meant she was going to divorce him. He stated at one point Debra was crying and told Carl she would be better off dead. According to Carl, he asked if she was planning anything and Debra replied that she did not have the courage. Carl stated that he went to bed at approximately 9:00 p.m. and woke up at 5:00 a.m. to discover that Debra was not there.

Carl further claimed that Debra's car had been moved from Tower Road because it had begun to rain and the car would have gotten stuck in the mud. Carl claimed that it was either the idea of Debra's father or the idea of his own father to take the car.

Harold Weibley ("Weibley") testified that he was a friend of Carl's in 1983. He testified that following Debra's death, he spoke to Carl on a number of occasions about her death. Weibley testified that two or three months after Debra's death, Carl told him that Debra came home late

from work on the Friday before she went missing. Weibley stated that Carl told him that he and Debra had an argument that night. He also testified that Carl told him that Debra was upset about her work and Carl told her that, "if it was going to upset her that much, why, maybe she should just quit work." Carl told Weibley that he and Debra went to bed Friday night and Carl woke up on Saturday morning and Debra wasn't there. Carl told Weibley that Debra's purse was at the trailer so he rode his motorcycle to Little Buffalo State Park to give it to her but her car was not there. Weibley stated that Carl told him that he (Carl) called the park in the late afternoon and was told Debra had not been to work.

Weibley testified that Carl told him that the search party had gone to Tower Road because it was an area that Debra really liked. Weibley stated that when Carl was telling him how Debra died, Carl made a hand gesture across his wrist to indicate that Debra had cut her wrist. Carl never mentioned any of the other injuries to Wiebley. Weibley testified that Carl never told him that Debra had been murdered. Instead, Carl always expressed that her death was the result of suicide.

Laurie Mohler ("Mohler") testified that she married Carl in 1988 or 1989 and they later divorced. She testified that Carl told her his first wife, Debra, had committed suicide by cutting her wrists. Carl told her that the police thought it was a murder.

Pamela Barkley ("Barkley") testified that she was a clerical supervisor for the Pennsylvania Department of Welfare and supervised Debra prior to Debra's employment at Little Buffalo State Park. She described Debra as "very diligent and "excellent." Barkley provided a recommendation for Debra when she applied to Little Buffalo State Park. Barkley further testified that Debra did not appear depressed and she would never believe that Debra would commit suicide. She told the Grand Jury that Debra loved her daughter very much and talked about her "all the time."

Michael Brennan ("Brennan") testified that he was the Little Buffalo State Park superintendent in 1983 and was responsible for hiring Debra. He described Debra as in the top 10 percent of the approximate 800 individuals he had hired over the course of his career. He testified that Debra was conscientious and seemed very comfortable with her job

11

responsibilities. He further testified that Debra gave him the impression that her husband and father-in-law were not happy that she was seeking employment outside of the family farm. He testified that Debra's husband once called him because he wanted to know what his wife would be doing at work. Brennan testified that Debra wanted to improve her life and was planning to go to college.

Carole Sutch ("Sutch") testified that she worked with Debra at Little Buffalo State Park. She testified that Debra was not having any difficulty learning her job there. The Grand Jury learned that Sutch saw Debra at work on Friday, April 22, 1983. She identified the sweater Debra was wearing when her body was discovered as being the sweater Debra was wearing at work on Friday.

Robert Gaffron ("Gaffron") testified that he also worked with Debra at Little Buffalo State Parle He testified that Debra was more than capable of doing her job. He also testified that he spoke with Debra on April 22, 1983 and the two discussed the fact that they would both be working the next day. Gaffron testified, however, that Debra did not report to work on Saturday.

Testimony revealed that the Pennsylvania State Police received a packet of documents from the records custodian of the Pennsylvania Liquor Control Board ("PLCB") related to the prospective employment of Debra. The Grand Jury was informed that on March 21, 1983, Debra received a "Certificate of Eligibles" for employment after successfully completing the state civil service examination. She was seeking full-time employment as a Clerk Typist II with the PLCB located in Harrisburg, Pennsylvania. Included within the packet was a letter of recommendation dated March 23, 1983 from Thelma I. Johnson, Income Maintenance Supervisor for the Perry County Board of Assistance/Department of Public Welfare. The letter reflected that Debra "could be depended upon to be prompt. She did not miss a day during her four months with our agency. She was always looking for a new challenge. Her attitude was superb, and Debra was a definite asset to our office."

The packet further indicated that Debra completed an employment application to the PLCB on April 15, 1983. The application reflected Debra's position at Little Buffalo State Park in the employment history

section with her salary listed as $10,289. The packet included an "interview notice/availability" survey which reflected that Debra was selected to be interviewed for the Clerk Typist II position at a salary of $12,245 on April 21, 1983. A letter dated April 25, 1983 confirmed that Debra was in fact selected for the position.

Additionally, David Peters testified that he was close with his sister, Debra. He testified that she was not having any problems at work. Dean Peters also told the Grand Jury that he was close with Debra and that she never expressed that she was having any problems at work. He stated that she did not seem depressed. Instead, she appeared happy and was a good mother. Dean testified that Debra graduated second in her class from high school. Elizabeth Peters Derr testified that she was with Debra the weekend before her death and that Debra was happy. She stated that Debra did not seem depressed and never mentioned problems at work. Elizabeth also testified that Debra was a loving mother.

Mark Peters informed the Grand Jury that Debra had called to ask him about getting a ride with Mark's father-in-law to the new job in Harrisburg and that she seemed excited about it. He stated that she sounded upbeat and did not seem depressed.

The Grand Jury received a report from Samuel Land, M.D. ("Dr. Lan), Chief of Medical and Forensic Pathology at Forensic Pathology Associates located in Allentown, Pennsylvania. Dr. Land reviewed the police reports, autopsy report of D.K. Chang, M.D., the consultation report by forensic pathologist Isidore Mihalakis, M.D., as well as scene and autopsy photographs. Dr. Land concluded that the cause of Debra's death was blunt force trauma to the head and torso. Dr. Land described the injuries to Debra's head to include:

> Stellate laceration of left parieto-temporal scalp; depressed skull fractures of the left temporal bone; subdural hemorrhage; left temporal lobe laceration; right temporal and frontal cerebral contusions; basilar skull fractures; contusions of the left parietal scalp; fractures of the left temporal bone, left parietal bone and left side of the occipital bone; and fractures of the right temporal bone and right side of the frontal bone.

13

He described the injuries to Debra's torso to include a fracture of a left rib, lacerations to the right lobe of the liver and laceration of the spleen.

Dr. Land determined that the blunt force trauma to the head was the result of several severe impacts and most likely would have caused altered consciousness immediately and would have caused death within minutes. He found that the trauma to the torso was caused by several blows to both sides of the body and would have caused death within minutes to hours.

Dr. Land also described lacerations to both wrists which were peri-mortem, in other words, at or near the time of death. Dr. Land determined that several tendons of both wrists had been cut and that it was extremely unlikely that the injuries were self-inflicted. Dr. Land determined that the injuries were inflicted in order to "imply suicidal activity."

Dr. Land determined that the manner of death was homicide.

The Grand Jury finds that Carl Rodgers concocted all of the claims that Debra was depressed as well as the claims that she was struggling at work in order to support his efforts to make her death appear to be a suicide and not a homicide. He was the only individual with a motive to make her death appear to be a suicide.

(Doc. 40-1 pp. 4-16.)

The Honorable J. Wesley Oler, supervising judge of the grand jury, issued an order on June 20, 2017, accepting the presentment and authorizing the Attorney General or his designee to prosecute Rodgers as recommended. Thereafter, on November 13, 2017, PSP filed a criminal complaint against Rodgers for murder, in violation of 18 Pa.C.S. § 2502(a), (c).

A jury trial was held in 2019. As part of the defense strategy at trial, Rodgers' criminal defense attorney, Geoffrey S. McInroy, Esquire ("McInroy"), pointed to potentially exculpatory evidence that was either not preserved or produced by Defendants. According to McInroy, that evidence included:

1. The bloody shirt of the deceased [Debra] Rodgers. The shirt she was wearing at the time her body was found. This would tend to show that the blood inside the sleeves was hers and was there when she cut her wrists before she died.

2. The bloody down jacket she was wearing at the time her body was found. This item would have revealed blood inside the sleeves that must have been deposited pre-mortem, contrary to the theory of the Commonwealth that her wrists were cut by Carl Rodgers perimortem.

3. The pants of the decedent with potential blood on the top of the thigh area (left and right) would have supported the defense theory that [Debra] Rodgers had cut her own wrists and, while in a seated position, blood from her wrists was deposited on her denim covered thighs.

4. The decedent's bra and underwear could have contained exculpatory evidence (i.e. genetic material) from an unknown alternative suspect.

5. The decedent's shoes could have contained potentially exculpatory evidence such as blood drips or spatter of [Debra] Rodgers' blood, supporting the defense theory that she suffered self-inflicted wounds to her wrists, stood and fell. They would also help to confirm that there was no evidence of dragging to refute the Commonwealth's assertion that her body was dragged by her killer.

6. Tissue samples from the wound on the left wrist of [Debra] Rodgers (including tissue samples from the hesitation cuts) would have been exculpatory because they would have demonstrated that the wrist

wounds were pre-mortem, contrary to the Commonwealth's theory that they were perimortem.

7. Tissue samples from the decedent's right wrist wound would have been exculpatory because they would have demonstrated that the wrist wounds were pre-mortem, contrary to the Commonwealth's theory that they were perimortem.

8. Executed and signed property logs for evidence collected but not produced, including a hair from the knife sheath, the driver's license of [Debra] Rodgers, and among other things, the family photo album and yearbook.

9. All negatives from the rolls of film used by the troopers photographing the crime scene and the autopsy that are clearly exculpatory, because the copies of photos that were produced were grossly pixelated and contained no fine detail for the examination by a defense expert. The photos that were eventually produced on the eve of trial were of a resolution dictated by the Commonwealth and there was no way of determining if the prints could have been further refined or otherwise improved without the actual negatives.

(Doc. 52-5, pp. 89-90.)

At the conclusion of trial—and after deliberating for only one hour—the jury acquitted Rodgers of Debra's murder.

Against this background, on November 13, 2020, Rodgers commenced this action by filing a complaint against PSP and the state troopers involved in the investigation, asserting that they violated his constitutional rights when they maliciously initiated a criminal proceeding against him without probable cause and

following what he claims was an inadequate and unreasonable investigation.[8] At the conclusion of discovery, Defendants filed a motion for summary judgment together with supporting papers.  The motion has been fully briefed and is ripe for disposition.

## II.   **Legal Standard**

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. *Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); *see also Celotex Corp v. Catrett*, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-57 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. *Pappas*, 331 F. Supp. 2d at 315.

---

[8]  Specifically, Rodgers asserts three claims pursuant to 42 U.S.C. § 1983: 1) a Fourteenth Amendment claim pursuant to *Brady* for failure to disclose exculpatory evidence and fabrication of inculpatory evidence; 2) a Fourth and Fourteenth Amendment malicious prosecution claim; and 3) a supervisory liability claim. (Doc. 1.)

## III.   <u>Discussion</u>

Section 1983 of Title 42 of the United States Code provides a cause of action to redress violations of federal law committed by state officials. *See* 42 U.S.C. § 1983. Section 1983 is not a source of substantive rights, but merely a method for vindicating those rights otherwise protected by federal law. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). To establish a claim under § 1983, a plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law." *Kneipp*, 95 F.3d at 1204 (quoting *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1141 (3d Cir. 1995)). There is no dispute that Defendants are state actors for purposes of § 1983. The court thus considers only whether Defendants deprived Rodgers of his constitutional rights.

### A. Malicious Prosecution and the Presumption of Probable Cause[9]

---

[9] The court notes that the complaint is devoid of any particular allegation made regarding the Fourteenth Amendment and that Rodgers' malicious prosecution claims instead largely implicate the Fourth Amendment. The Supreme Court has held that, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). This rule has been extended to preclude both procedural and substantive due process claims where the rights underlying the same are derived from and otherwise protected by the Fourth Amendment. *See Meketa v. Kamoie*, 955 F. Supp. 2d 345, 365 (M.D. Pa. 2013) (citing *Robinson v. Clemons*, 987 F. Supp. 280, 284-85 (D.Del.1998) (substantive due process claim premised on "no probable cause" argument is governed by Fourth, not Fourteenth, Amendment); *Posey v. Swissvale Borough*, No. 2:12-CV-955, 2013 WL 989953, at *15 (W.D. Pa. Mar. 13, 2013) (plaintiff's claims of false arrest and malicious prosecution "are more properly analyzed under the Fourth Amendment rather than procedural due process")). Thus, where the core of a plaintiff's claim arises from allegations of unlawful arrest,

Rodgers' main contention in this case is that Defendants maliciously prosecuted him for murder without probable cause in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Under § 1983, malicious prosecution is established by showing that: (1) the defendant commenced a criminal proceeding; (2) the proceeding terminated in the plaintiff's favor; (3) the defendant "initiated the proceeding without probable cause;" (4) the defendant acted maliciously or with a purpose apart from bringing the plaintiff to justice; and (5) the plaintiff "suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Halsey v. Pfeiffer*, 750 F.3d 273, 296-97 (3d Cir. 2014). Under prong three, a showing of probable cause is a complete defense to civil liability. *Goodwin v. Conway*, 836 F.3d 321, 327 (3d Cir. 2016).

As is relevant here, probable cause exists when the facts and circumstances within the officer's knowledge would convince a reasonable person that an individual has committed an offense. *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995); *accord Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005) ("While 'the probable-cause standard is incapable of precise definition or quantification,' all interpretations of probable cause require a belief of guilt that is

---

imprisonment, or prosecution, courts are directed to analyze those claims through the prism of the Fourth and not the Fourteenth Amendment. The court will therefore address Rodgers' claims through the Fourth Amendment.

reasonable, as opposed to certain.") Although the question of probable cause is generally left to the jury, a court may conclude based on the totality of the circumstances that probable cause exists as a matter of law if the evidence, viewed most favorably to the nonmoving party, reasonably would not support a contrary finding.[10] *Goodwin*, 836 F.3d at 327 (citation and quotations omitted).

Significantly, in a malicious-prosecution suit, "a grand jury indictment or presentment constitutes prima facie evidence of probable cause to prosecute." *Woodyard v. Cty. Of Essex*, 514 F. App'x 177, 183 (3d Cir. 2013) (quoting *Rose v. Bartle*, 871 F.2d 331, 353 (3d Cir. 1989); *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 251 (3d Cir. 2001) (noting that an indictment establishes probable cause "by definition"). This is called the "presumption of probable cause," and Rodgers, who was charged as recommended by the grand jury's presentment, can only rebut it by showing that the presentment resulted from "fraud, perjury or other corrupt means." *Costino v. Anderson*, 786 F. App'x 344, 347 (3d Cir. 2018)

---

[10] As the Third Circuit has noted, "[t]here is tension inherent in evaluating probable cause at the summary judgment stage." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468 (3d Cir. 2016). The summary judgment standard asks whether there is a genuine dispute as to any material fact. The probable cause standard, on the other hand, "allows for the existence of conflicting, even irreconcilable, evidence." *Id.* (citing *Wright v. City of Phila.*, 409 F.3d 595, 603 (3d Cir. 2005)). Thus, the summary judgment standard as it pertains to probable cause "must tolerate conflicting evidence to the extent it is permitted by the probable cause standard." *Id.* That is, where a reasonable jury could conclude that the facts, viewed in the light most favorable to the nonmoving party, did not demonstrate a "fair probability" that a crime occurred, "only then would the existence of conflicting evidence rise to the level of a genuine dispute as to any material fact." *Id.*

(citations and quotations omitted). To make that showing, Rodgers suggests that corrupt means should be presumed at this stage not only from the fact that a second grand jury was convened decades after his wife's death without any new evidence being uncovered but also because the presentment was successfully procured based on wholly circumstantial evidence and in the absence of potentially exculpatory evidence. In effect, he argues that Defendants maliciously reinstituted the proceedings without probable cause, which, in and of itself, is tantamount to fraud, perjury or other corrupt means. But the record shows otherwise.

Though the state troopers may have overlooked some evidence or failed to present other evidence to the grand jury, Rodgers does not insinuate—and the record does not support—that the troopers fabricated any evidence. Instead, Rodgers argues that probable cause was necessarily lacking due to the troopers' ignoring or mishandling potentially exculpatory evidence, including their failure to collect and preserve Debra's clothing and to produce tissue samples and the knife sheath to the grand jury or during pretrial discovery. Also undermining any possible finding of probable cause, according to Rodgers, is that the 2015 grand jury did not hear testimony from his daughter Christine, who in April 1984, at approximately six years

old, testified that her mother left the home on her own the night she went missing while her father stayed behind with her.[11] (Doc. 52 p. 4.)

Even if this evidence was favorable to Rodgers, which is questionable, it does not undercut probable cause. First, failing to disclose potentially exculpatory evidence, such as Christine's testimony, differs from affirmatively falsifying evidence, committing perjury, or engaging in corrupt means to obtain an indictment. *Costino*, 768 F. App'x at 348. In fact, investigators and prosecutors are under no obligation to present exculpatory evidence—let alone *potentially* exculpatory evidence—to grand juries. *Id.* (citing *United States v. Williams*, 504 U.S. 36, 53 (1992)).

Second, the alleged failure to produce certain evidence in discovery, such as the tissue samples and knife sheath, occurred after Rodgers was indicted and thus

---

[11] Rodgers similarly complains that several of the officers who interviewed Christine failed to ask pertinent questions and to include summaries of her statements in their reports. (*See* Doc. 52 p. 4) ("Christine Rodgers was interviewed by Trooper Richard L. Geedey in 1998. The interview report makes no reference to any inquiry as to what Ms. Rodgers remembered on the evening of April 22, 1983. Trooper Geedey . . . testified that despite the fact Christine Rodgers['] testimony could be important information, [he] does not remember asking Christine what she specifically could recall from that evening and he acknowledged his report did not reflect making such an inquiry. Christine Rodgers was interviewed by Defendant Troopers Denisch and Moyer in 2016. The interview report makes no reference to any inquiry as to what Ms. Rodgers remembered on the evening of April 22, 1983. Trooper Moyer . . . testified that the aforementioned report did not list any specific questions of Christine's observations of neither her mother nor father that evening . . . . Defendant Trooper Moyer . . . testified that he was not aware of Christine Rodgers['] testimony at the 1984 Grand Jury Proceeding. Defendant Trooper Denisch . . . testified that although he was aware of the convening of the 1984 Grand Jury, he was not aware of Christine Rodgers['] testimony.") (citations omitted).

could not have influenced the grand jury's presentment.[12] To the extent Rodgers is implying that these later actions, or inactions, are relevant to show a malicious course of conduct on the part of Defendants, the court is unpersuaded because Rodgers has not proffered any evidence of actual malice, let alone anything to suggest a course of conduct.

Third, the purported deficiencies in the investigation and the allegedly exculpatory evidence that was either not preserved or not presented to the grand jury does not negate the compelling, albeit circumstantial, evidence that the investigators presented. *See Costino*, 786 F. App'x at 348 (requiring a plaintiff bringing a malicious prosecution claim to show that the evidence in question was "material, or necessary to the finding of probable cause") (citing *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000)). The overwhelming evidence presented to the grand jury included Rodgers' inconsistent statements regarding Debra's disappearance; his leading Debra's family directly to the location of Debra's missing car on a remote rode; the discovery of Rodger's knife near her body; his not asking if she was dead or alive when she was found; his admission that they had engaged in a physical fight

---

[12] Defendants dispute that they were in possession of any tissue samples and, thus, that they could have presented any findings from the samples to the grand jury or provided them to the defense during discovery. (Doc. 53 p. 13.) Regardless, the details surrounding the tissue samples are not pertinent to the court's analysis.

on the night in question;[13] and an expert witness report by Dr. Land opining that Debra died from blunt force trauma to the head and that the slashes to her wrist were unlikely to be self-inflicted.  Thus, even if the grand jury had known about the troopers' failure to collect Debra's bloody clothing, for example, or had been presented with Christine's distant recollections of the night in question, there was still more than enough evidence to support probable cause.[14]

Fourth, the court need not delve into the details regarding any omissions or discrepancies in the investigation, such as the purported misstatements in the PSP report. A mere failure to disclose or misstatement of a fact, such as who first spotted Debra's car of found her keys, does not equate to acting with malice. In any event, this purported evidence was immaterial because it does not thwart probable cause.

In sum, these alleged errors and omissions fall well short of suggesting malice or rebutting the presumption of probable cause. Despite Rodgers' insistence that these are triable issues of fact, a court's obligation to draw all reasonable inferences in favor of the non-moving party when deciding a motion for summary judgment

---

[13] As detailed in the grand jury's presentment, though Rodgers could not recall if he hit Debra on the night she purportedly left the home alone, he did acknowledge that he had grabbed her during their fight.

[14] When asked whether the grand jury should have been made aware that Debra's clothing was not collected, Trooper Denish astutely replied: "No. It was not inculpatory or exculpatory. It wasn't there so why would we tell them about evidence that we don't have? There could have been evidence on [the clothing] that implicated Mr. Rodgers." (Doc. 53 p. 13.)

24

does not authorize it to jump leaps and bounds to infer a nefarious motive in the absence of any such suggestion.[15] Summary judgment will therefore be granted on Rodgers' malicious prosecution claim. [16]

## B. Brady Violation

Relying on many of the same allegations underlying his malicious prosecution claim, Rodgers argues that Defendants' alleged failures to preserve Debra's clothing, produce the tissue samples, and present Christine's account of the night her mother went missing deprived him of due process in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In essence, Rodgers urges this court to find that, although he was ultimately acquitted of the murder charge, he was denied his right to a fair process

---

[15] Rodgers apparently asks this court to make an unreasonable inference when he alleges that Defendants sought to fabricate autopsy photographs for trial. In support of this allegation, Rodgers cites an email sent by a PSP trial technologist discussing the creation of demonstrative trial exhibits and offering to "make one up of the autopsy photos." (*See* Doc. 53-1 p. 1.) However, a plain reading—indeed, the only reasonable reading—of this email does not permit the inference of collusion to falsify evidence.  Instead, enlarging photographs is common trial practice designed to assist the jury in viewing the exhibit simultaneously.

[16] Though not necessary at this juncture, these shortcomings would also entitle Defendants to qualified immunity. Public officials are entitled to qualified immunity unless their conduct violated a clearly established constitutional right. Thus, to resolve a claim of qualified immunity, courts engage in two distinct inquiries: whether, based on the evidence of record, the plaintiff has shown a violation of a constitutional right and, if so, whether the right was clearly established at the time of the alleged violation. *Goodwin v. Conway*, 836 F.3d 321, 326-27 (3d Cir. 2016). The Fourth Amendment right to be free from prosecution without probable cause where a deprivation of liberty occurs was well established at the time in question. *Gallo*, 161 F.3d at 222. However, the court's finding of probable cause is a complete defense to Rodgers' constitutional claims and entitles Defendants to qualified immunity. *Goodwin* at 327.

due to Defendants' purported suppression of this evidence. This position, however, is contrary to law in this Circuit.

In *Brady*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process if the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. Although "this duty of disclosure is tightly tethered to constitutional guarantees of due process, 'the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense.'" *Smith v. Holtz*, 210 F.3d 186, 196 (3d. Cir. 2000) (quoting *Kyles v. Whitley,* 514 U.S. 419, 436-37 (1995). Instead, a failure to disclose rises to the level of a constitutional violation "only if the government's evidentiary suppression undermines confidence in the outcome of the trial.'" *Id.* (quoting *Kyles,* 514 U.S. at 434); *see also Strickler v. Greene,* 527 U.S. 263 (1999) ("[S]trictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.") It therefore follows that where the § 1983 plaintiff was acquitted of the charges against him, *Brady* is not implicated. *Telzer v. Borough of Englewood Cliffs*, 783 F. App'x 253, 258 (3d Cir. 2019); *Frameli v. Singer*, 2:19-CV-00331, 2020 WL 475750, at *3 (W.D. Pa. Jan. 29, 2020) (finding no § 1983 *Brady* violation where § 1983 plaintiff had been acquitted on all criminal charges);

*Muchinski v. Solomon*, 258 F. Supp. 3d 534 (W.D. Pa. 2017) (explaining that a plaintiff must demonstrate by a preponderance of the evidence a causal link between the *Brady* violation and his *conviction*).

Accordingly, because Rodgers was acquitted of his wife's murder, he cannot recover pursuant to § 1983 for a due process *Brady* violation. In other words, there necessarily can be no undermining of the confidence in the outcome of the trial to Rodger's prejudice since, after all, he prevailed. [17]

### C. Supervisory Liability

Finally, Rodgers' inability to advance factual matter that plausibly establishes a constitutional violation necessarily bars a § 1983 claim based on supervisory liability. To establish supervisory liability, Rodgers must show that a supervisor at PSP "participated in violating [his] rights, or that he directed others to violate them, or that he ... had knowledge of and acquiesced in his subordinates' violations." *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-91 (3d Cir. 1995). However, as is logically implied, a supervisor cannot be liable in the absence of an underlying constitutional violation by a supervisee.  *Crawford v. Lappin*, 446 F. App'x 413, 416 (3d Cir.2011) (citing *Argueta v. U.S. Immigration and Customs Enforcement,* 643 F.3d 60, 70 (3d

---

[17] The court notes, in passing, that even if Rodgers had been convicted, the allegations underlying his *Brady* claim are meritless. The failure to collect or preserve certain evidence does not amount to withholding it, and further, this evidence was clearly not material as Rodgers was, in fact, acquitted.

Cir. 2011). *See e.g. Cabrera v. Clark*, No. 1:16-CV-00392, 2018 WL 347729, at *7 (M.D. Pa. Jan. 10, 2018) (Rambo, J.) ("The Court need not address Defendant Killian's argument regarding supervisory liability since the Court has found no constitutional violation and accordingly, a supervisory claim cannot lie.") (citing *Powell v. Weztel*, No. 1:12-cv-2455, 2014 WL 2472088, at *4 (M.D. Pa. June 3, 2014)); *Dempsey v. Bucknell Univ.*, 76 F. Supp. 3d 565, 579 (M.D. Pa. 2015) ("[I]n order to assert a claim under Section 1983 of either supervisory liability or bystander liability, a violation of that section must have occurred."); *Mitchell v. Flaherty,* No. 2:11–cv–610, 2012 WL 266467 at *8 (W.D. Pa. Jan.30, 2012) (interpreting *Arguenta* to preclude all forms of § 1983 supervisory liability in the absence of a constitutional violation); *Agarwal v. Schuylkill Cnty. Tax Claim Bureau*, No. 3:09-CV-1921, 2010 WL 5175090, at *9 (M.D. Pa. July 28, 2010), *report and recommendation adopted*, No. 3:09-CV-1921, 2010 WL 5175003 (M.D. Pa. Dec. 15, 2010) ("When there is no constitutional violation, there can be no local governmental or individual supervisory liability.") This court has already held that Rodgers' claims for malicious prosecution and a *Brady* violation fail as a matter of law. Thus, by logical extension, his supervisory liability claim also fails.

**IV.**   **Conclusion**

For the reasons set forth above, Defendants' motion for summary judgment will be granted in its entirety. An appropriate order shall follow.


*s/Sylvia H. Rambo*
SYLVIA H. RAMBO
United States District Judge


Dated: March 28, 2024